## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD KOOKER, Derivatively on Behalf of HECLA MINING COMPANY,<br><br>    Plaintiffs,<br><br>v.<br><br>PHILLIPS S. BAKER, JR., LINDSAY A. HALL, LAWRENCE P. RADFORD, THEODORE CRUMLEY, CATHERINE J. BOGGS, GEORGE R. JOHNSON, GEORGE R. NETHERCUTT, JR., STEPHEN F. RALBOVSKY, TERRY V. ROGERS, and CHARLES B. STANLEY,<br><br>    Defendants,<br><br>and<br><br>HECLA MINING COMPANY, a Delaware corporation,<br><br>    Nominal Defendant. | Civil Action No.<br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**<br><br><br><br>JURY DEMAND |

Plaintiff Donald Kooker ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment derivatively for the benefit of Nominal Defendant Hecla Mining Company ("Hecla" or the "Company"). Plaintiff bases his allegations on personal knowledge and, as to all other matters outside his personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class actions, *Batter v. Hecla Mining Company*, C.A. 1:19-cv-04883-ALC (S.D.N.Y.) filed May 24,

2019 and *Bhattacharya v. Hecla Mining Company*, C.A. 1:19-cv-05719 (S.D.N.Y.) filed June 18, 2019 (the "Securities Class Actions"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## I.      INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Hecla against certain of its officers and directors seeking to remedy their violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. Defendants' actions have caused substantial financial and reputational harm to Hecla.

2.      Hecla is a mining company based in Coeur d'Alene, Idaho. It is engaged in discovering, acquiring, developing, and producing silver, gold, lead, and zinc. The Company produces lead, zinc, and bulk concentrates, which it markets to custom smelters and brokers, and unrefined bullion bars containing gold and silver, which are further refined before sale to precious metals traders.

3.      On March 19, 2018, Hecla announced it was acquiring three high-grade Nevada gold mines through the purchase of Klondex Mines Ltd. ("Klondex") for a mix of cash and stock worth $462 million. It represented that "Klondex's three operating mines – Fire Creek, Midas and Hollister [collectively the "Nevada Operations"] – are some of the highest-grade gold mines in the world." According to the Company's press release, "Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput." Midas is an older mine that had been in production for decades but was still purportedly providing production and cash flow. Hollister was important for the prospective development and mining of the Hatter Graben discovery, a large system of veins which could be reached from Hollister.

2

4.      After the acquisition closed in July 2018, Hecla's Nevada Operations became its fifth operating segment joining the Greens Creek, Lucky Friday, Casa Berardi, and San Sebastian units.

5.      Beginning on March 19, 2018, the Individual Defendants (defined at ¶ 30 below) made or allowed the Company to make improper statements in its SEC filings, press releases, and other public disclosures concerning its Nevada Operations. For example, the Individual Defendants falsely and misleadingly represented, or allowed to be represented, that "[a]fter extensive due diligence" the Company determined that the Nevada Operations would be "accretive" and cash flow positive, or at the very least "self-funding."

6.      Throughout 2018 and continuing into 2019, the Company touted the "robust cash flows" of the Nevada mines, stating that "[t]hese assets immediately add production and cash flow," claiming that "[t]he Nevada assets are basically self-funding" and asserting that "Nevada itself will be cash flow positive for us."  Unfortunately for the Company and its shareholders, this was not true.

7.      On May 9, 2019, Hecla shocked investors when it issued a press release entitled "Hecla Reports First Quarter 2019 Results[;] Nevada operations under review," in which the Company disclosed a "comprehensive review" of its Nevada Operations that it characterized during the ensuing conference call as "really just asking the question, are we going to get the return for the investment we're making?" The Individual Defendants admitted that because the Nevada Operations suffered from negative cash flow and other negative operating metrics, they were uncertain whether Hecla would ever get a positive return on its investment and that it might need to write off the Nevada Operations. Hecla's President and CEO added, in the Company's conference call:

> A year ago when doing the due diligence, we recognized certain problems with Fire Creek dealing with the tough material, managing the water, equipment availability, getting enough development to have consistent production, lack of characterization of ore types and while we've made progress in dealing with the issues we saw, the short answer is, it's not been enough.

8.      Securities analysts who followed the Company were taken aback by this sudden, unexpected revelation, particularly given what one analyst characterized as the continuous flow of "upbeat comments" from the Company regarding the Nevada Operations. An analyst from J.P. Morgan expressed his confusion at this unexpected development and later issued a report, entitled "Buyer's Remorse: Comprehensive Review of Nevada Operations Under Way; Negative," questioning whether the announcement reflected a "teething problem" with ramping up production or "something more serious."

9.      On this news, the price of Hecla's common stock plunged more than 23% over the course of two trading days, from a closing price of $2.04 per share on May 8, 2019 to $1.56 per share on May 10, 2019, wiping out $230 million of market capitalization.

10.      On June 6, 2019, Hecla issued a press release entitled "Hecla Reduces Spending for Nevada Operations," in which it announced that going forward it would only mine currently developed ore at Fire Creek, while Midas would be mined only through year end, and Hollister would be shuttered. Additionally, Hecla would curtail exploration of Hatter Graben to reduce cash consumption. As a result, the Company would lay off 25% of its Nevada workforce and its guidance for the Nevada Operations would be reduced by 20% to 60,000 ounces.

11.      As a direct result of this unlawful course of conduct, the Company is now the subject of the Securities Class Actions. The Securities Class Actions assert claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Hecla and the several of its top executives in connection with the Company's improper and misleading statements.

12.     Due to Hecla's Board of Directors' (the "Board") direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act. Accordingly, Plaintiff brings this action to remedy the harm to Hecla caused by the Individual Defendants' faithless actions.

## II.     JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over each of the defendants because each defendant has expressly or implicitly consented to personal jurisdiction through, among other things, the forum selection clause adopted by Hecla's Board which requires that the sole and exclusive forum for a shareholder derivative action is a Delaware state or federal court. Additionally, each defendant is either a Delaware corporation or an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each Defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this jurisdiction pursuant to section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) because Hecla is a Delaware corporation and this action

is governed by a forum selection clause which requires that the sole and exclusive forum for a shareholder derivative action is a Delaware state or federal court.

## III.   PARTIES

### A.   Plaintiff

16.    Plaintiff Donald Kooker is a current stockholder of Hecla and has continuously owned such shares since 1999.

17.    Plaintiff will hold Hecla shares continuously throughout the pendency of this action. Plaintiff brings this action derivatively in the right of and for the benefit of Hecla. Plaintiff will fairly and adequately represent the interests of Helca and its stockholders in enforcing the rights of the Company.

### B.   Nominal Defendant

18.    Nominal Defendant Hecla, incorporated on August 7, 2006, is engaged in discovering, acquiring, developing, and producing silver, gold, lead, and zinc. Its principal executive offices are located at 6500 North Mineral Drive, Suite 200, Coeur d'Alene, Idaho. The Company's shares trade on the NYSE under the ticker symbol "HL."

### C.   Individual Defendants

19.    Defendant Phillips S. Baker, Jr. ("Baker") has served as Hecla's CEO since May 2003, its President since November 2001, and a member of its Board since 2001. He previously served as Hecla's CFO from May 2001 to June 2003, COO from November 2001 to May 2003, and Vice President from May 2001 to November 2001. He has also served as a director of QEP Resources, Inc., an independent natural gas and oil exploration and production company, since May 2010, and he served as a director of Questar Corporation, a Western U.S. natural gas-focused exploration and production, interstate pipeline and local distribution company, from February 2004 through June 2010. Baker has been a member of the Board's Executive Committee

since at least 2002. Baker is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Baker knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Baker also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Baker as follows:

| SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | CHANGE IN PENSION VALUE AND NON-QUALIFIED DEFERRED COMP. EARNINGS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|
| $635,000 | $870,859 | $1,844,625 | $317,452 | $18,606 | $3,686,542 |

20.     Defendant Lindsay A. Hall ("Hall") has been Senior Vice President, CFO and Treasurer of the Company since July 2016. Hall is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Hall knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. In 2018, Hecla paid Hall as follows:

| SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | CHANGE IN PENSION VALUE AND NON-QUALIFIED DEFERRED COMP. EARNINGS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|
| $380,000 | $401,987 | $733,817 | $126,137 | $18,210 | $1,660,151 |

21.     Defendant Lawrence P. Radford ("Radford") has been the Company's Senior Vice President – Operations since October 2011. Radford is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Radford knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. In 2018, Hecla paid Radford as follows:

| SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | CHANGE IN PENSION VALUE AND NON-QUALIFIED DEFERRED COMP. EARNINGS | OTHER COMPENSATION | TOTAL COMPENSATION |
|--------|--------------|---------------------------------------|------------------------------------------------------------------|--------------------|--------------------|
| $399,500 | $635,428 | $883,150 | $61,551 | $18,606 | $1,998,235 |

22.     Defendants Baker, Hall, and Radford are collectively referred to herein as the "Securities Class Action Defendants."

23.     Defendant Theodore Crumley ("Crumley") has served as Chairman of the Board since May 2006 and as a director of the Company since 1995. Crumley previously served as Executive Vice President and CFO of OfficeMax Incorporated. Crumley has been a member of the Board's Executive and Compensation Committees since at least 1999. Defendant Crumley knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Crumley also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Crumley as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|------------------------------|--------------|------------------------|--------------------|
| $197,000 | $84,740 | --- | $281,740 |

24.     Defendant Catherine J. Boggs ("Boggs") was appointed to Hecla's Board in January 2017. Boggs was General Counsel at Resource Capital Funds from January 2011 until February 2019 and prior to that she served as Senior Vice President, Corporate Development at Barrick Gold Corporation. Boggs is the current chairperson of the Board's Corporate Governance/Directors Nominating committee and has been a member of this committee and the Audit and Compensation Committees since 2017. Defendant Boggs knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Boggs also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Boggs as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $98,000 | $84,740 | --- | $182,740 |

25.     Defendant George R. Johnson ("Johnson") was appointed to Hecla's Board in March 2016. Johnson was Senior Vice President of Operations of B2Gold Corporation from August 2009 until May 2015. Johnson previously served as Senior Vice President of Russian Operations for Kinross Gold Corporation and Senior Vice President of Operations for Bema Gold Corporation. Johnson has been a member of the Board's Audit Committee and Health, Safety, Environmental & Technical ("HSE&T") Committee (formerly the Technical Committee) since at least 2017 and the Corporate Governance/Directors Nominating Committee since at least 2018. Defendant Johnson knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Johnson also negligently violated section 14(a)

of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Johnson as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $94,000 | $84,740 | $7,500 | $186,240 |

26. Defendant George R. Nethercutt, Jr. ("Nethercutt") was appointed to Hecla's Board in February 2005. Nethercutt has served as Principal of Nethercutt Consulting LLC, a strategic planning and consulting firm, from January 2007 until January 2012. Nethercutt has been a member of the Board's Compensation Committee, and its chairperson from 2008 until 2017, and the Corporate Governance/Directors Nominating Committee, and its chairperson in 2017 and 2018, since at least 2007, and a member of the HSE&T committee since 2019. Defendant Nethercutt knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Nethercutt also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Nethercutt as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $100,000 | $84,740 | --- | $184,740 |

27. Defendant Stephen F. Ralbovsky ("Ralbovsky") was appointed to Hecla's Board in March 2016. Ralbovsky was a partner with PricewaterhouseCoopers LLP from February 1987 until June 2014. Ralbovsky has been a member of the Board's Audit and Corporate Governance/Directors Nominating Committees since 2016, and Chairperson of the Audit Committee and a member of the HSE&T Committee since at least 2017. Defendant Ralbovsky knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's

10

Nevada Operations. Defendant Ralbovsky also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Ralbovsky as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $110,000 | $84,740 | --- | $194,740 |

28.     Defendant Terry V. Rogers ("Rogers") was appointed to Hecla's Board in May 2007. Rogers was Senior Vice President and COO of Cameco Corporation (the world's largest uranium producer) from February 2003 until June 2007. Rogers also served as President of Kumtor Operating Company, a gold producing company, and a director of Centerra Gold Inc. Rogers has been a member of the Board's Executive Committee since at least 2016, a member of the HSE&T committee since at least 2007 and its Chairperson from 2011 until 2017, a member of the Compensation committee since at least 2008 and its Chairperson since at least 2017, and a member of the Audit Committee from 2009 until 2017. Defendant Rogers knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Rogers also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Rogers as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $110,000 | $84,740 | $3,750 | $198,490 |

29.     Defendant Charles B. Stanley ("Stanley") was appointed to Hecla's Board in May 2007. Until his retirement in January 2019, Stanley was the CEO, President and a director of QEP Resources, Inc., an independent natural gas and oil exploration and production company, since May 2010, and Chairman of QEP's board of directors since May 2012. Stanley has been a

member of the Board's Audit Committee since at least 2007 and its Chairperson from 2015 until 2018, a member of the Corporate Governance/Directors Nominating Committee since at least 2011, and Chairperson of the HSE&T Committee since at least 2017 and a member since at least 2007. Defendant Stanley knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Defendant Stanley also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2018 and 2019 Proxy Statements. In 2018, Hecla paid Stanley as follows:

| FEES EARNED OR PAID IN CASH | STOCK AWARDS | ALL OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|
| $110,000 | $84,740 | --- | $194,740 |

30.    Defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley are collectively referred to as the "Director Defendants." Defendants Boggs, Johnson, Ralbovsky, and Stanley are collectively referred to as the "Audit Committee Defendants." Defendants Johnson, Ralbovsky, Rogers, and Stanley are collectively referred to as the "HSE&T Committee Defendants." Defendants Boggs, Nethercutt, Ralbovsky, and Stanley are collectively referred to as the "Corporate Governance Committee Defendants." All of the foregoing individuals are sometimes collectively referred to as the "Individual Defendants."

## IV.    DEFENDANTS' DUTIES

### A.    The Individual Defendants' Fiduciary Duties

31.    By reason of their positions as officers and/or directors of Hecla and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant

owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

32.     Because of their positions of control and authority as officers and/or directors of Hecla, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Hecla, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hecla and was at all times acting within the course and scope of such agency.

34.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Hecla. By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

     a.     exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

     b.     neither violate nor knowingly permit any officer, director, or employee of Hecla to violate any applicable laws, rules, or regulations;

     c.     remain informed as to the status of Hecla's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a

reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.   establish and maintain systematic and accurate records and reports of the business and affairs of Hecla and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.   maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Hecla are conducted in accordance with all applicable laws, rules, and regulations; and

f.   truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.   Duties Pursuant to the Company's Corporate Governance Guidelines**

35.   The Company's Corporate Governance Guidelines ("Governance Guidelines") were adopted by the Board to, along with the Certificate of Incorporation, Bylaws, and Board Committee Charters, form the framework for governance of the Company. These guidelines apply to the Director Defendants in connection with their membership on Hecla's Board.

36.   According to the Governance Guidelines, the Board's primary responsibilities include the following:

The primary responsibilities of the Board are to oversee management performance on behalf of the shareholders, to ensure that the long-term interests of the shareholders are being served, to monitor adherence to the Company's standards and policies, to exercise responsible corporate citizenship, and generally to perform the duties and responsibilities assigned to the Board by the laws of Delaware, the state of incorporation of the Company.

The Board fulfills these functions by, among other things:

• overseeing the management of the business and affairs of the Company;

\*       \*       \*

• overseeing risk management by satisfying itself that the risk management processes designed by management are adequate and functioning as designed;

\*       \*       \*

14

- verifying that processes are in place to maintain the integrity of the Company's financial statements, accounting practices, and risk management policies, to ensure compliance with applicable laws and regulations; and

- adopting policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

37.    Board member responsibilities include the following:

A director owes certain fiduciary duties to the Company, including the duty of care and the duty of loyalty. A director's duty of care refers to the responsibility to exercise appropriate diligence in overseeing the management of the Company, making decisions and taking other actions. A director's duty of loyalty refers to the responsibility to act in good faith and in the Company's best interests, not the interests of the director, a family member or an organization with which the director is affiliated. Directors shall not use their positions for personal gain. Finally, it is the responsibility of each director to ensure that other commitments do not conflict or materially interfere with the director's duties and responsibilities to the Company.

38.    With respect to risk oversight, the Governance Guidelines state: "The Board provides independent risk oversight with a focus on the most significant risks facing the Company, including strategic, operational and reputational risks."

**C.    Duties Pursuant to the Company's Code of Conduct**

39.    The Individual Defendants were also bound by the Company's Code of Conduct (the "Code"), which applies to all Hecla directors, officers, and employees. The Board and its Corporate Governance Committee are charged with overseeing compliance with the Code, while the General Counsel is responsible for administration of the Code. Upon commencement of employment, each director, officer, and employee must sign an acknowledgement form stating that he or she has read and understands the Code and will abide by its terms. Directors, officers, and employees are also required to confirm compliance with the Code on an annual basis.

40.    Among other things, the Code states that: "Our Code is what guides the way we work and it requires us to demonstrate our values—[including] . . . honesty and integrity . . . ."

41.     With respect to upholding the core values of honesty and integrity, it states that the Individual Defendants are responsible for:

- Performing our duties and responsibilities with integrity and professionalism

                            *       *       *

- Exercising care to not misrepresent Hecla
- Promoting honest, safe and ethical conduct
- Making decisions/taking actions in the best interest of Hecla
- Showing the courage to do and say the right thing

42.     With respect to the Individual Defendants' responsibilities for legal compliance, it states:

All directors and employees must comply with all applicable laws and regulations, and with the provisions of this Code. Ultimately, our conduct is our own responsibility. We should never commit dishonest, destructive, or illegal acts even if directed to do so by a supervisor or co-worker, nor should we direct others to act improperly.

In all our business relationships, we must comply with the domestic and foreign laws and regulations affecting our business. These laws include, but are not limited to, federal and state securities and business laws (including those of the Securities and Exchange Commission "SEC") . . . .

43.     With respect to the Individual Defendants' responsibilities for accounting and internal controls it states:

The Company is responsible for making and keeping books, records and accounts, which in reasonable detail, accurately and fairly present the transactions and disposition of the assets of our Company. Accounting procedures and controls are prescribed by, among other things, Company policies. Within these policies, the senior officers of the operating companies have the primary responsibility for establishing and monitoring adequate systems of internal accounting and controls, and all employees must adhere to these controls. The Company's management and auditors monitor and document compliance with these internal controls. Employees shall cooperate completely and forthrightly with the Company's internal and independent auditors. In short, every one of us, regardless of our position in the Company, has an obligation to ensure that any information we provide for the Company's financial records is complete, accurate and timely.

16

44.     With respect to the Individual Defendants' responsibilities concerning securities laws, it states: "The Company is committed to complying with all federal and state securities laws and regulations. These laws, along with the rules of the New York Stock Exchange, impose certain obligations on publicly held corporations and the persons associated with them."

45.     With respect to the Individual Defendants' responsibilities concerning public disclosure of information, it states:

> The Company discloses information to the public on a regular basis. Employees responsible for making the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, are responsible for preparing these disclosures in compliance with applicable securities laws and rules. The Company's SEC filings and other public communications should contain full, fair, accurate, timely and understandable disclosures.

> Each Employee who is involved in the Company's disclosure process must: (a) be familiar with and comply with the Company's accounting and disclosure rules and controls and procedures, and generally accepted accounting principles, and cooperate fully with the Company's internal and external auditors; and (b) take all necessary steps such that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

**D.     Duties of the CEO and CFO Pursuant to the Company's Code of Ethics**

46.     Defendants Baker and Hall, as Hecla's CEO and CFO, are also bound by the Company's Code of Ethics, as set forth in relevant part below:

> This Code of Ethics applies only to the Chief Executive Officer ("CEO"), Chief Financial Officer and Chief Accounting Officer or Controller ("Senior   Financial Officers"). Because the equity shares of the Company are publicly traded, and to ensure full, fair, timely and understandable disclosure in the Company's periodic reports filed with the Securities and Exchange Commission ("SEC"), the CEO and Senior Financial Officers are held to an especially high set of ethical standards, which are in addition to any other Code of Business Conduct and Ethics the Company may adopt for its employees. These standards are described below:

>> 1. The CEO and Senior Financial Officers are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports, which are required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO and each Senior Financial Officer promptly to bring to the attention of the Disclosure Committee any material

information of which he or she may become aware that affects the disclosures made by the company in its public filings or otherwise assist the Disclosure Committee in fulfilling its responsibilities.

2. The CEO and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Committee and the Audit committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

*     *     *

4. The CEO and each Senior Financial Officer shall promptly bring to the attention of the Chairman of the Board or the CEO and to the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Business Conduct and Ethics or of these additional procedures.

*     *     *

6. The CEO and each Senior Financial Officer shall carefully review a draft of each periodic report for accuracy and completeness before it is filed with the SEC.

*     *     *

9. Establish and administer disclosure and financial accounting controls and procedures that are appropriate to ensure the integrity of the financial reporting process and the availability of timely, relevant information for the safe, sound and profitable operation of the Company and to ensure that material information is included in each periodic report during the period in which the periodic report is being prepared.

*     *     *

11. Consult with the Audit Committee to determiner [sic] whether the Audit Committee has identified any weaknesses or concerns with respect to internal controls.

12. Confirm that neither the Company's internal auditor nor its independent auditors are aware of any material misstatements or omissions in the draft periodic reports, or have any concerns about the managements discussion and analysis section of the periodic reports.

**E.      Additional Fiduciary Duties of the Audit Committee Defendants**

47.      In addition to the fiduciary duties discussed above, the Audit Committee Defendants owed specific duties to Hecla under the Audit Committee's Charter (the "Audit Charter"). According to the Audit Charter, the Audit Committee was responsible for assisting the Board in overseeing: "(i) the integrity of the Company's financial statements; (ii) the independent auditor's qualifications and independence; (iii) the performance of the Company's system of internal audit function and the independent auditor; (iv) the Company's compliance with legal and regulatory requirements, including disclosure controls and procedures; and (v) the effectiveness of the Company's internal controls over financial reporting."

48.      The Audit Charter charges the Audit Committee Defendants with the following duties and responsibilities, among others:

**D. <u>Financial Reporting and Risk Control</u>**

1. Review the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro-forma," or "adjusted" non-GAAP information), as well as review any financial information and earnings guidance provided to analysts and rating agencies.

2. Review and discuss with management (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (ii) major issues as to the adequacy of the Company's internal controls; and (iii) any special audit steps adopted in light of material control deficiencies or weaknesses.

*          *          *

5. Review and discuss with management their risk assessment and the Company's risk management policies, as well as receive and review periodic reports concerning any matters that could have a material effect on the Company's financial statements and compliance policies, including legal, environmental, taxation, credit, and regulatory.

6. Review and discuss with management and the independent auditor the Company's annual and interim financial statements and determine whether they are complete and consistent with the information known to Committee members and assess whether the financial statements reflect appropriate accounting principles.

\*       \*       \*

14. Ensure principal areas of financial risk are identified and that plans and processes are in place to manage or mitigate these risks.

**E. <u>Legal Compliance</u>**

1. In the course of performing the duties and responsibilities set forth in the Charter, the Committee shall discuss with management, the independent auditor and the internal auditor(s) the Company's policies, procedures and programs regarding compliance with established standards of corporate conduct and applicable laws, regulations and listing standards.

2. Ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public, comply with applicable legal requirements.

\*       \*       \*

4. Review any evidence of material violations of securities law, breach of fiduciary duty or similar violation by the Company or any Company agent disclosed to the Committee by the Company's counsel.

\*       \*       \*

7. Report regularly to the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, its compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, and the performance of the internal audit function.

**F.       Additional Fiduciary Duties of the HSE&T Committee Defendants**

49.       In addition to the fiduciary duties discussed above, the HSE&T Committee Defendants owed specific duties to Hecla under the HSE&T Committee's Charter (the "HSE&T Charter"). According to the HSE&T Charter, the HSE&T Committee's primary purpose is assisting the Board in oversight responsibilities relating to, among other things:

- Reviewing data and making recommendations to the Board on exploration, development, and acquisition or divestiture of mineral properties and/or operations;

- Reviewing special management reports of the Company and its subsidiaries related to the progress of development projects, particularly with major capital expenditures;

*     *     *

- Management of risks relating to any of the foregoing;

50. The HSE&T Charter charges the HSE&T Committee Defendants with the following duties and responsibilities, among others:

- Annually review (or upon significant material change in) resources and reserves;

- Review data and make recommendations to the Board concerning the advisability of proceeding with the exploration, development, acquisition or divestiture of mineral properties and/or operations;

51. The HSE&T Charter also charges the HSE&T Committee Defendants with the following "Additional Powers and Responsibilities," among others:

- In carrying out its responsibility to assist the Board in overseeing the potential development and operation of any projects or future expansion or development thereof from a technical, financial and scheduling perspective, the Committee will meet regularly with management, in person or by telephone, and will review, monitor and report to the Board on:

  ➢ Mine construction, operations, development and production;

  ➢ Mine production plans, as proposed and revised from time to time and the implementation of such plans;

52. In undertaking the foregoing responsibilities: "The Committee may, in its sole discretion, retain, obtain the advice of or terminate any experts or consultants ("Advisers") as it deems appropriate."

## V.  BREACHES OF DUTIES

53. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hecla, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

21

54.     The Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations including, *inter alia*, that they would be accretive and cash flow positive or at minimum self-funding. The Individual Defendants knew or were reckless in not knowing that the Company's newly acquired Nevada mines faced many undisclosed material problems that would prevent the operations from being cash flow positive or even cash flow neutral. These unlawful practices wasted the Company's assets and caused Hecla to incur substantial damage.

55.     The Board and the Corporate Governance Committee members had a duty to properly oversee compliance with Hecla's Code of Conduct. The Code, which applies to all directors, officers, and employees, requires compliance with all applicable securities laws and rules by, among other things, ensuring the Company's SEC filings and other public communications contain full, fair, accurate, timely, and understandable disclosures. As described herein, the Corporate Governance Committee Defendants and the other Board members breached their duty of loyalty and good faith by failing to properly oversee compliance with the Code by, *inter alia*, allowing the improper statements and securities law violations described herein.

56.     Defendants Baker and Hall have additional duties under the Company's Code of Ethics. These duties, under this "especially high set of ethical standards," include establishing and administering appropriate disclosure and accounting controls and otherwise ensuring full, fair, timely, and understandable disclosure concerning the Company and its operations. As described herein, Baker and Hall breached these heightened duties by approving or otherwise allowing the improper statements and by failing to appropriately establish and administer Hecla's public disclosure controls and procedures to prevent such improper statements.

57.     The Audit Committee members had a duty to properly oversee Hecla's compliance with legal and regulatory requirements, including public disclosure controls and procedure, as well as its risk assessment and management, and internal control functions. As described herein, the Audit Committee Defendants breached their duty of loyalty and good faith by approving or otherwise allowing the improper statements, and by failing to properly oversee Hecla's compliance with legal and regulatory requirements, public disclosure controls and procedure, risk assessment and management, and internal control functions.

58.     The HSE&T Committee members had a duty to properly oversee the Company's mine construction, operations, development and production, and to manage risks relating to the foregoing. As described herein, the HSE&T Committee Defendants breached their duty of loyalty and good faith by failing to properly oversee the Company's mine construction, operations, development, and production, and/or by failing to manage risks relating to the false and misleading public disclosures relating to the Nevada Operations.

59.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Hecla, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.

## VI.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Hecla, regarding the Company's future prospects and the Individual Defendants' management and oversight of Hecla's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Hecla and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

62.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper public statements.

63.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations and future prospects.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

66.    Hecla is engaged in discovering, acquiring, developing and producing silver, gold, lead, and zinc. The Company and its subsidiaries provide precious and base metals to the United States and around the world. The Company produces lead, zinc, and bulk concentrates, which it markets to custom smelters and brokers, and unrefined bullion bars (dore) containing gold and silver, which are further refined before sale to precious metals traders.

67.    In the fall of 2017, Hecla contacted Klondex, a North American gold mining company based in Reno, Nevada, seeking to conduct an exploratory due diligence review of the company in contemplation of a possible purchase of Klondex and/or its assets.

68.    Klondex's assets included three Nevada mines—Fire Creek, Midas, and Hollister— which are some of the highest-grade underground gold mines in the entire world.

69.    On November 9, 2017, the Klondex board of directors approved Hecla's request to undertake due diligence after which Hecla signed a confidentiality agreement. On November 21, 2017, Hecla was granted access to a digital data room which contained an overview of, among other things, Klondex's Nevada mines. The Company followed up its data review and analysis with site visits to the Fire Creek, Hollister, and Midas mines beginning on January 10, 2018.

70.    On January 23, 2018, Hecla contacted Klondex's management and indicated that a proposal would be forthcoming. The next day, the Company delivered to Klondex a proposal letter which included a non-binding proposal to acquire all of Klondex's outstanding stock for

$630 million in cash and Hecla stock. After defendant Baker spoke with Klondex's Chairman on January 28, 2019, the offer was increased to $647 million the next day.

71.     In February 2018 the price of Klondex's shares declined sharply, from $2.27 per share on February 1st to $1.32 per share on February 28th, following Klondex's release of its production results for 2017, and production guidance for 2018, and the February 6, 2018 release of an updated report on mineral reserves and resources at Fire Creek. The Fire Creek mine report showed a significant decline in both contained gold ounces and gold grade.

72.     According to a February 9, 2018 The Northern Miner article entitled "Klondex sees grades drop at Fire Creek gold mine":

> On Feb. 6, Klondex released an upgraded technical report showing that Fire Creek's underground proven and probable gold reserves had dropped 22%, while average grades were down 42% to 24.3 grams gold per tonne.
>
> The project now hosts 289,000 proven and probable tonnes grading 24.3 grams gold and 23.66 grams silver for 229,000 equivalent oz. gold.
>
> Meanwhile, Fire Creek's measured and indicated resources were hit with a 28% grade drop, and now total 622,000 tonnes at 23.33 grams gold and 23.33 grams silver for 473,000 oz. gold equivalent.
>
> *       *       *
>
> BMO Capital Markets analyst Brian Quast cut his price target on Klondex by 25¢ to $2.50 per share. He noted that tonnage had increased at Fire Creek, but that "grades and ounces suffer."
>
> "It is our contention that very little, if any, of the open-pit resources at Fire Creek will be high enough grade to truck to the Midas mill," Quast wrote.

73.     Given these developments, Hecla and Klondex began exploring a deal at a lower purchase price. Hecla continued its due diligence of Fire Creek and conducted additional site visits as negotiations continued. Ultimately, a final agreement for the acquisition of Klondex and its Nevada mines was reached and executed by the parties on March 16, 2018.

74.     On March 19, 2018, Hecla publicly announced that it was acquiring the three high-grade Nevada gold mines through the acquisition of Klondex for a mix of cash and stock worth $462 million. Defendant Baker represented that "Klondex's three operating mines – Fire Creek, Midas and Hollister – are some of the highest-grade gold mines in the world" and that "[a]fter extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise."

75.     The Hollister mine was important to Hecla for the prospective development of the Hatter Graben, a large system of veins Hecla said it could reach from Hollister. Midas was an older mine that had been in production for decades but was still purportedly providing production and cash flow. However, of the three, the Fire Creek mine was the primary driver of the acquisition.

76.     A graphic depiction of the Fire Creek mine, from a slide in Hecla's Fourth Quarter and 2018 Earnings Call presentation, shows the layout of the mine and the areas of past, present, and future development:



77.     After the acquisition closed in July 2018, the Nevada Operations became Hecla's fifth operating segment joining the Greens Creek, Lucky Friday, Casa Berardi, and San Sebastian units.

**B.     The Individual Defendants' Breaches of Duty Result in a Series of Improper Statements**

78.     As detailed below, between March 2018 and April 2019, the Individual Defendants made or allowed the Company to make improper statements in its SEC filings, press releases and other public statements concerning its Nevada Operations.

79.     On March 19, 2018 the Company issued a press release entitled: "Hecla to Acquire Three High-Grade Nevada Gold Mines with the Acquisition of Klondex Mines Ltd.," which stated in part:

> Hecla Mining Company (NYSE:HL) (Hecla) and Klondex Mines Ltd. (NYSE American:KLDX) (TSX:KDX) (Klondex) today announced Hecla will acquire all the outstanding shares of Klondex, a high-grade Nevada underground gold producer with its Fire Creek, Midas and Hollister mines, through a plan of arrangement (the Transaction). Klondex's Canadian assets will be spun out to its existing shareholders.
>
> Under the Transaction, Hecla will acquire Klondex for consideration of US$462 million with a mix of cash and shares of Hecla common stock and the newly formed company (Klondex Canada). Klondex's shareholders will receive US$2.47 per share in cash or shares of Hecla, which represents a 59% premium to Klondex's 30-day volume-weighted average price, as at March 16, 2018 on the NYSE American.
>
> \*       \*       \*
>
> ***After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. . . . We expect this transaction to be accretive on many important financial and credit metrics***, with potentially significant synergies.

(Emphasis added). Under a section entitles "Benefits to Hecla Shareholders," it further stated in part: "Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput."

80.    Later, on March 19, 2018, during a conference call that followed the press release,

defendant Baker stated, among other things:

> The first thing I want you to know is **_these assets are not new to us_**. About a decade
> ago, we actually owned a box within Hollister. . . . **_It's a great low capital and
> potentially high return strategy similar to what we are doing in Mexico_**. So
> periodically, we reached out to Paul, and then **_about four months ago, we began
> our due diligence. As part of this work, we were granted access to the properties
> and key people, which gave us significant insights into the properties, particularly
> Fire Creek_**.
>
>                *       *       *
>
> [T]he principal driver for this deal is Fire Creek and the hundred thousand plus
> ounces of gold it produces a year. **_It has a great cost profile_** and it's the highest-
> grade gold mine of significant scale in North America.
>
>                *       *       *
>
> **_Paul and his team has done a really good job of understanding the geology_**. . . .
>
>                *       *       *
>
> While Fire Creek is the driver of the transaction, we're also excited about the
> prospects for Hollister and Midas. At Hollister, it's primarily about the prospective
> Hatter Graben project with over 1,400 vertical feet of veins and over 2,000 feet of
> strike. . . . While Midas has a short mine life, there is a big resource position that
> gives us optionality to higher prices and we're going to probably continue the
> exploration that Klondex has started on the Trinity.

(Emphasis added).

81.    Also, on March 19, 2018, in response to an analyst that asked what the ongoing

maintenance capital expenditures for the Nevada mines would be, defendant Baker represented

that factoring in exploration and development costs at Fire Creek, Midas, and Hollister, the

operations would be cash flow positive:

> [B]ut all of this stuff is relatively small capital. That was one of the things that
> struck us is we can acquire this. **_Nevada itself will be cash flow positive for us.
> There is no capital outlay that we're looking to, in Nevada, that's going to
> consume all of the cash flow that will be generated from the three mines_**.

(Emphasis added).


82.     The statements made on March 19, 2018 were materially false and misleading when made and omitted to state the following material facts:

(a)     that the Nevada Operations would drain significant cash which would be necessary to resolve a multitude of material problems first identified by the Company during its extensive due diligence of the Nevada mines prior to the announced acquisition;

(b)     it was unlikely that the Fire Creek mine would become cash flow neutral any time in the near term due to a decline in gold reserves and grades which was first identified in a February 2018 technical report; and

(c)     that as a result, the Individual Defendants had no reasonable basis for their representations that the Nevada Operations would soon be in a position to have positive or self-funding cash flow.

83.     On May 10, 2018, during the conference call to discuss first quarter financial results, defendant Baker stated, in part, with respect to the deal that:

> We saw three large, in this case Nevada, properties as big as those that we already have and we saw extraordinary grades similar to what we see at Greens Creek. We saw the likelihood of converting the Fire Creek resources that are identified at a higher grade as we develop it. And we saw numerous operational improvement possibilities and we sell properties where the exploration team at Klondex seems to crack the core geologically for making further discoveries.
>
> But there is still a lot to learn and we expect the deal to close around the end of June [-] ***everything is on track***.

(Emphasis added).

84.     On July 23, 2018, Hecla issued a press release announcing that the Company had completed the acquisition of Klondex. The July 23, 2018 press release stated, among other things:

> "With this acquisition, Hecla now has three high-grade mines in Nevada, one of the best mining districts in the world," said Phillips S. Baker, Jr., President and CEO. "***These assets immediately add production and cash flow***, and because they are a good fit with Hecla's expertise, we believe there is significant opportunity for improvement in the mines' productivity and consistency.

(Emphasis added).

85.    The statements made on May 10, 2018 and July 23, 2018 were materially false and

misleading when made for the same reasons set forth in ¶ 82 above.

86.    On August 9, 2018, the Company reported financial results for the second quarter

of 2018 ended June 30, 2018. The August 9, 2018 press release stated, among other things:

> "We have now closed the acquisition of the high-grade Nevada mines, and are
> beginning their integration into Hecla," Mr. Baker added. "Our plan is to operate
> the mines and mill as one unit, allocating the workforce and capital to generate
> margins and *focus on profitability, not just on production for production's sake.*
> *Fire Creek has the best margin of the 3 mines by a considerable amount*, so
> ramping it up is our priority. . . ."

(Emphasis added).

87.    Also, on August 9, 2018, during the conference call to discuss second quarter

financial results, defendant Hall stated, among other things:

> As is our mantra at Hecla, all operations need to generate positive cash flows in
> their mine plans and we expect Nevada will be no different. *The Nevada assets are*
> *basically self-funding.* The cash flow from production pays for the $11 million in
> development and definition drilling expenditures in the last half of the year, and as
> well, $5 million related to the completion of the new tailings facility plus the CIL
> planned improvements . . . .

(Emphasis added).

88.    During the question and answer portion of the August 9, 2018 conference call,

defendant Baker reiterated that the Nevada operations would be self-funding from the start:

> [**John David Bridges**, *Senior Analyst*:] Good morning, Phil, everybody. I just
> want to dig into cash flows. Your intention is to have the Nevada assets being cash
> flow neutral to you as soon as possible. When is that likely to be? And then, when
> will they be contributing to the portion of debt that they've – that you are sort of –
> you have taken on in the form of the revolver to run those, just to start with?

> [**Baker:**] Well, I guess two things. *One is the expectation is this year that for the*
> *five months, it will be self-funding. We're not anticipating needing to contribute*
> *additional capital into it.* And two, we haven't drawn on the revolver. Our net cash
> position is positive.

(Emphasis added).

89.     On November 8, 2018, the Company reported financial results for the third quarter of 2018 ended September 30, 2018. The September 30, 2018 press release stated, among other things:

> "*Our strategy is working. The EBITDA we generated* despite low metals prices *is a result of the improvements we made in our mines.* A case in point is Casa Berardi, which is generating strong cash flow, with lower costs, higher mine throughput and an extended mine life," said Phillips S. Baker, Jr., President and CEO. "*The Nevada operations are on the same path as Casa Berardi and Greens Creek, with the development and processes which should increase throughput and make the mines more efficient. In the meantime, the higher costs in Nevada are short-term and a function of electing to produce less to avoid sterilizing newly discovered mineralization.*"

With respect to the Fire Creek mine, the release further stated:

> "In the 100 days we have owned the Nevada properties we have been in continuous change - winding down Midas, *resolving the roadbed issues at Fire Creek*, advancing the development at Hatter Graben, and completing the capital projects on the mill and tailings facility. We expect the pace of change to continue as we commission a new batch plant that should improve ground control, test a road-header to improve mining in soft rock and rework the mine plan as we gain more knowledge. *However, we don't believe we will need to make significant new financial investment to put the mine on the same improvement path that we have seen at Greens Creek and Casa Berardi*," said Mr. Phillips S. Baker, Jr.

(Emphasis added).

90.     In connection with reporting third quarter financial results, the Company held a conference call on November 8, 2018 during which defendant Radford stated, in part:

> *[O]ur goal for Nevada operations is that the operations are cash-neutral*, including Hatter Graben development and the Fire Creek development ramp-up.

(Emphasis added).

91.     Also, on November 8, 2018, during the question and answer session of the conference call to discuss third quarter financial results, defendant Baker responded to analyst questions regarding the cash costs of the Nevada Operations:

32

> But essentially, ***this thing is going to generate the cash flow necessary for it to do the ramp up of development in 2019***.

<div align="center">*       *       *</div>

> [W]e're not anticipating the need to make significant contributions into Nevada, right? We see Nevada being able to largely pay for the Hatter Graben, to pay for the development within Fire Creek. ***We think we can run it pretty close to cash flow neutral. And that is what we have suggested we would be able to do.***

Defendant Hall further stated:

> No, I'll just say this. It's exactly where we thought we'd be. ***We acquired Nevada for the cash flowing potential at the Fire Creek. That will start happening***.

(Emphasis added).

92.    On December 4, 2018, the Company held a conference call at the Bank of America

Merrill Lynch Leveraged Finance Conference during which defendant Hall stated, in part:

> ***There's no major capital expenditures that we can't fund out of the Nevada operations***. So we're really quite pleased with the transaction.

(Emphasis added).

93.    The statements made on August 9th, November 8th, and December 4, 2018 were

materially false and misleading when made and omitted to state the following material facts:

(a)    that the Nevada Operations were hemorrhaging cash due to the Company's

attempts to resolve a multitude of material problems first identified by the Company during

its extensive due diligence of the Nevada mines prior to the announced acquisition;

(b)    it was unlikely that the Fire Creek mine would become cash flow neutral

any time in the near term due to a precipitous decline in gold reserves and grades which

was first identified in a February 2018 technical report;

(c)    it was unlikely that the Fire Creek mine would become cash flow neutral

any time in the near term due to a multitude of known but undisclosed and unresolved

problems causing a significant increase in Hecla's costs and the concurrent decrease in ore grade; and

> (d)     that as a result of the multitude of undisclosed and unresolved problems, the Individual Defendants had no reasonable basis for their representations that the Nevada Operations were or would soon be in a position to have positive or self-funding cash flow.

94.     On February 21, 2019, the Company reported financial results for the fourth quarter and year ended December 31, 2018. The February 21, 2019 press release stated, among other things:

> "Greens Creek and Casa Berardi are the economic engines of Hecla, and the continued increase in reserves and resources, extended mine life and positive changes to the mine plans are surfacing additional value at these operations," said Phillips S. Baker, Jr., President and CEO. "This allows investment in our three other mines, which all have the potential to be long-lived with strong economics like Greens Creek and Casa Berardi. ***The turnaround of the Nevada operations continues with an increasing development rate at Fire Creek that should allow the mine to have operating consistency as we increase production.*** This is the same approach we took when we first acquired Greens Creek and Casa Berardi. Substantial exploration is planned for both Fire Creek and Hollister this year as we work to convert resources to reserves and discover additional resources. With the Hatter Graben decline about 15% complete, we expect to start drilling between the current Hollister mine area and the Hatter Graben soon."

(Emphasis added).

95.     Also, on February 21, 2019, during the conference call to discuss fourth quarter and full year financial results, defendant Baker stated the following concerning the Nevada Operations:

> *[W]e've made significant progress*. Much of it will not be visible to you and many statistics yet, but *Larry is going to talk to you about the progress we've made in development. It's been significant*, but we're still trying different ways of dealing with different conditions in the mine. So while we're in a hurry to get to a steady state, we will take the time necessary to figure out the challenges of these mines, so our Nevada operations will deliver value for the long-term.

Speaking about costs, defendant Hall stated:

> We're happy with our cost at our operating units other than Nevada operations which we reported higher cost, ***while we work through what we believe are transitional issues***.
>
>         \*       \*       \*
>
> ***We expect in 2019, the Nevada mining operations will be cash flow positive***, but we'll invest those cash flows in more in exploration around the various Nevada mine sites and the development of the Hatter Graben and decline.

(Emphasis added).

96.      During the February 21, 2019 conference call, defendant Radford also stated the following concerning the progress made in 2018:

> Let's move on to Nevada on Slide 15, where most of our focus is this year. We have a plan to turnaround the access and we are working on that plan. ***In 2018, the focus was on getting the operations back on track in terms of understanding ground conditions at Fire Creek and getting the team organized.***
>
> ***We have come a long way in this regard***. Our strategy is simple, develop and drill. We believe that the grades can be improved through new discoveries and resource conversion and ore production can be ramped up by opening up more working zone. Fire Creek, we have done review of equipment and we're adding equipment from Midas and from buying some new equipment.
>
> We've added two trucks, two large loaders, one jumbo, two bolters to the Nevada fleet for cost of total of about $6 million with the expectation that the upgrade will increase productivity. The implementation of shaft fleet into the development process is resulting in better ground conditions as expected, which should minimize and need to go back and rehab development immediately as was the case on the priority management.
>
> The CIL plant upgrade is complete and the mill is now able to process Hollister ore [indiscernible]. We have exceeded our annual development target of 35 feet per day in January as shown on Slide 16 and the goal will be to maintain this level and increase it were possible because this should open up additional headings and increase production.
>
> We have wrapped up Fire Creek manpower for underground manpower from 76 to about 110 through transfer of Midas in the Hollister miners. Our contractor has brought in a roadheader at Fire Creek and it's easily cutting the soft tough material, which is helping to speed up development and we are considering a wider application of this type of chain.

> *We're planning to increase Fire Creek throughput midyear to about 520 tons per day from 340 tons per day which was the fourth quarter average, which means that the gold production will be weighted towards the second half of the year. The increased development is an important step for Dean's group as we have worked to do definition drilling to upgrade resources and exploration to discover additional resources.*

(Emphasis added).

97.     Also, on February 21, 2019, during the question and answer session of the conference call to discuss fourth quarter and full year financial results, an analyst asked defendant Baker:

> If I may, my questions are mostly on Fire Creek here. I understand that Fire Creek and the entire sort of Nevada complex is still a work in progress, but certainly in 2018 a transitional year, there were some disappointments with the decrease of reserves beyond what was produced. I'm just trying to get a better understanding in terms of what has been the biggest surprise to you at these Nevada assets in terms of reserves, in terms of production, as ownership has handed -- since ownership has been handed over to Hecla?

In response, defendant Baker did not discuss any of the undisclosed issues with Fire Creek or any other Nevada mine, but instead complained that Klondex did not follow its budget and therefore development had lagged behind, stating: "But I think the biggest surprise and disappointment was the Klondex didn't follow the budget that they had presented to us."

98.     On the February 21, 2019 conference call, defendants Baker and Radford also described progress with respect to water in the Fire Creek mine:

> [**Heiko Ihle**, *Senior Metals & Mining Analyst*:] And speaking of Nevada and following up from the question that Cosmos have asked. I mean you mentioned, the increasing the throughput at Fire Creek from 350 tons per day to 520 tons per day by 2019. You've also been stated your focus on, and this is from your lease, maintaining the development grade and all ground conditions. Am I reading something into here that's not there? Is there something I missing? I thought the ground conditions are into that mine as the ground conditions at Fire Creek are actually pretty solid. Is there -- are there pockets that need extra ground support? Or again am I missing something there?

> [**Baker:**] Yes, when you remember when we brought it, we talked about fact that we had this tuff that created road conditions that we have to come in with the

Case 1:19-cv-01299-CFC   Document 1   Filed 07/12/19   Page 37 of 64 PageID #: 37

synthetic liner and build a road base. Well, that's -- so, we dealt with the road conditions, but you have that same condition on the back and on the rigs. And so that's what Larry is alluded to with shaft treating that we've have to do and that's why we're contemplating the road header going through this soft material. Larry?

**[Radford:]** Yes, it's variable, you can see very good ground conditions for albeit 24 feet a day and a given heading. And then times we run into altered tuffs and very clay like material that take short rounds and requires a fair amount of support. And the additional [indiscernible] it's variable.

**[Baker:]** And then you also have the introduction of water into this tuff, which again -- if you think about if you look at those pictures of the road, you get a sense of how soupy it becomes and difficult to operate in. And so, we're trying to figure out the best way to deal with the changing ground conditions. And so, that's why I continue to make a point that we're experimenting, we're trying new things. I'm more interested in Larry coming to a series of standards depending on the ground conditions rather than just being so worried about getting the development. But, Larry.

**[Radford:]** You've mentioned water, there's perks water in certain pockets and we're looking at a bit more of a mobile dewatering plan so that we're not managing the water underground. So yes, we've shown, as Phil alluded, we've shown photos of some of the poor conditions and what we're doing to manage them. We've got the right team there. I mentioned the roadheader, it's actually a very small roadheader that we're trialing right now. And if it continues to perform as well as it seems to be, we may go all in for a large roadheader, I'm a really large roadheader and really jack up the advanced grade.

99.     The statements made on February 21, 2019 were materially false and misleading when made for the same reasons set forth in ¶ 93 above. Additionally, defendant Baker's and Radford's statements regarding water in the Fire Creek mine were materially misleading when made because in choosing to speak about the problem with "changing ground conditions" and the need for "a series of standards," they failed to fully disclose the depth of this problem in parts of the mine and the significant negative effect it was having and would have on mining operations and the ability of the mine to become cash flow neutral.

100.    On February 22, 2019, Hecla filed its Annual Report with the SEC on Form 10-K for the year ending December 31, 2018. The 2018 Form 10-K spoke of problems at Fire Creek due to an earlier lack of development and the Company's development and plans for mining in 2019:

*There has been a lack of investment in mine development, including horizontal drifts ("Haulages") and the ramp or decline system ("Spirals"), at Fire Creek. As a result, there have not been sufficient platforms to keep quality targets in the pipeline to replenish reserves as they are depleted. In late 2018, definition drilling focused on the upper portions of Spiral 3 along the Honeyrunner, Karen and Hui Wu structures and the up-dip southern extents of Joyce, 06 and 08 veins to advance the Spiral 4 area.* Underground drift development is advancing Haulage 9 to provide an exploration drill platform by early next year. This platform will enable exploration drilling to further drill and extend Spiral 9 veins to the south and the Karen structure back to the north.

*In 2019, the emphasis of definition drilling is expected to be on bringing Spiral 4 and Spiral 9 mineralized material into indicated resource inventories.* Definition drilling at Spiral 3 is proposed south of Spiral 2, to follow up on previous significant drilling intercepts south of Spiral 9 and north of the 5350 North Haulage. Drilling will also continue to focus on upgrading resources along strike on the Titan Zone. An area of future potential drifting is to the north of the North Haulage at the 5350-elevation following up on surface success on veins to the northeast of the current Fire Creek mine.

(Emphasis added).

101.    The statements made in the 2018 Form 10-K on February 22, 2019 regarding mining at Fire Creek and the Company's plans for 2019 were materially false and misleading when made because while choosing to speak about issues with the mine due to a lack of earlier development, and the mining of Spiral 4, the Individual Defendants failed to disclose the multitude of ongoing, undisclosed and unresolved problems (including the severe water issues with Spiral 4) which would make such development extremely unlikely or impossible in the near term.

102.    The 2018 Form 10-K, which was signed by defendants Baker and Hall, also purported to warn that the anticipated benefits from the recent acquisition of Klondex might not materialize:

*We may not realize all of the anticipated benefits from our acquisitions, including our recent acquisition of Klondex.*

We may not realize all (or any) of the anticipated benefits from any acquisition, such as increased earnings, cost savings and revenue enhancements, for various reasons, including difficulties integrating operations and personnel, higher than expected acquisition and operating costs or other difficulties, unknown liabilities

which may be significant, inaccurate reserve estimates, unrealized exploration potential, mill recoveries that are lower than required for portions of the orebodies to be economic, and fluctuations in market prices.

**_The properties we may acquire may not produce as expected, and we may be unable to determine reserve potential, identify liabilities associated with the acquired properties or obtain protection from sellers against such liabilities_**.

The properties we acquire in any acquisition, including our recently-acquired Nevada Operations unit, may not produce as expected, may be in an unexpected condition and we may be subject to increased costs and liabilities, including environmental liabilities. Although we review properties prior to acquisition in a manner consistent with industry practices, such reviews are not capable of identifying all existing or potential adverse conditions. Generally, it is not feasible to review in depth every individual property involved in each acquisition. Even a detailed review of records and properties may not necessarily reveal existing or potential problems or permit a buyer to become sufficiently familiar with the properties to fully assess their condition, any deficiencies, and development potential.

(Emphasis in original).

103.   The statements made on February 22, 2019 regarding the potential risks of Hecla's acquisitions were materially false and misleading when made because they suggest that such issues "may" arise when in fact they had already arisen in a significant and material way. Instead of disclosing the multitude of ongoing, undisclosed and unresolved problems which were causing an increase in Hecla's costs and the concurrent decrease in ore grade, the Individual Defendants chose to limit their public disclosures to the release of a continual stream of "upbeat" comments regarding the progress at the Company's Nevada Operations. Additionally, the statements were false and misleading for the same reasons set forth in ¶ 93 above.

104.   On April 18, 2019, the Company issued a press release entitled "Hecla Reports 2.9 Million Ounces of Silver and 60,021 Ounces of Gold Production in First Quarter 2019." The release stated in relevant part:

**Nevada Operations**

At the Nevada operations, 10,364 ounces of gold and 67,438 ounces of silver were produced. ***During the quarter, the focus continued on establishing a robust development program in a variety of ground conditions at Fire Creek*** and Hollister, rather than on production which is expected to be second half-weighted this year. ***A minor amendment to the water discharge permit for Fire Creek is expected in the second quarter which should enable a higher discharge rate.*** In addition, changes to the carbon circuit of the Midas mill are expected to improve recoveries. Ore was processed at an average of 460 tpd (combined Midas and Aurora mills).

(Emphasis added).

105.   The statements made on April 18, 2019 regarding water in the Fire Creek mine were materially misleading when made because in choosing to speak about "establishing a robust development program in a variety of ground conditions" and mentioning a "minor amendment to the water discharge permit for Fire Creek," the Individual Defendants failed to fully disclose the depth of this problem in parts of the mine and the significant negative effect it was having and would have on mining operations and the ability of the mine to become cash flow neutral.

**C.     The Truth Emerges**

106.   On May 9, 2019, Hecla shocked investors when, before the market opened, the Company issued a press release entitled "Hecla Reports First Quarter 2019 Results[;] Nevada operations under review," in which the Company disclosed a comprehensive review of its Nevada Operations and the suspension of annual production and cost estimates for its Nevada Operations. Specifically, the May 9th Press Release admitted that the Nevada Operations were currently and would likely continue to be cash flow negative:

> ***While Nevada operations had better development advance rates, the operating metrics including cost, grade and negative cash flow, were unacceptable***. We are reviewing our Nevada operations to determine the best path forward and expect the results of this review in the second quarter. In the meantime, we are suspending our annual Nevada estimates for production and cost.

<p style="text-align:center">*       *       *</p>

> The annual production and cost outlook have been suspended for Nevada pending
> the results of the comprehensive review.

(Emphasis added).

107.     Also, on May 9, 2019, during a conference call, investors learned that Hecla was

likely facing a large write-down of its recently acquired Nevada assets due to uncertainty as to

whether Hecla would ever see a return on its investment in the Nevada mines. Defendant Baker

made the following statements concerning the rationale for the review of the Nevada Operations

and suspension of outlook for those operations:

> *A year ago when doing the due diligence, we recognized certain problems with*
> *Fire Creek dealing with the tough material, managing the water, equipment*
> *availability, getting enough development to have consistent production, lack of*
> *characterization of ore types*. And while we've made progress in dealing with the
> issues we saw the short answer is it's not been enough. The advance rate has
> increased, but the mill tonnage decreased by a similar percentage in the last quarter.
> And while we've done things to manage the water, the amount of water has
> increased, making the conditions worse.
>
> *              *              *
>
> *This process is really maintaining our discipline and capital allocation, we're*
> *really just asking the question, are we going to get the return for the investment*
> *we're making. Since we don't know the outcome of the review, we are suspending*
> *guidance until we do.*

(Emphasis added).

108.     Further, a number of analysts posed questions indicating their shock at the severity

of the problems that had not previously been disclosed. For example, a J.P. Morgan analyst asked

the following:

> [**John David Bridges,** *Senior Analyst***:**] Just wondered if you could give us a bit of
> color on what the problems actually are in Nevada? We heard about the water.
> You're waiting on some permits, is that part of it? And you say you've demobilized
> the contract. *Does that mean that you stopped advancing the exploration*
> *terminals which were related to the upbeat comments that you've been giving as*
> *on exploration success? I'm just a bit confused here.*

> **[Baker:]** Sure. ***With respect to the water, what it has done is it's limited places that we're able to go in the mine because we cannot deal with the water fast enough to be able to effectively move forward.***

(Emphasis added).

109.    On May 9, 2019, the price of Hecla's common stock declined by $0.27 per share, or 13.24%, to close at $1.77 per share, causing a loss of more than $130 million in market capitalization.

110.    Following the May 9, 2019 disclosures, at least two analyst reports indicated surprise over the disclosed problems and potential complete shutdown of the Nevada Operations.

111.    A Cantor Fitzgerald report dated May 9, 2019 stated as follows:

> **Pencils Down in Nevada** – A plethora of challenges are facing Hecla at its Nevada operations. These range from extra dewatering requirements, poor grade reconciliation relative to the mine plan, metallurgical challenges with refractory ore, and underperformance of the mining contractor, among several others. Hecla is in the process of completing a comprehensive review of its Nevada Operations that may result in a complete production shutdown across Fire Creek, Hollister, and Midas.

112.    A J.P. Morgan report dated May 9, 2019 stated:

> **Buyer's Remorse: Comprehensive Review of Nevada Operations Under Way; Negative**
>
> The key takeaway from this result is the suspension of guidance for the newly acquired Nevada mines. ***We expect intense questioning of management to determine if this is a teething problem with the ramp back up of production or something more serious.*** Hecla said it had the opportunity to do extensive due diligence on the assets before the purchase, so it should just be the former. However, at a time when the company is preparing to refinance its high-yield debt, this uncertainty needs to be resolved quickly. The combination of the earnings miss and the suspended forecasts for Nevada will likely cause the stock to open sharply lower.

(Emphasis added).

113.    On May 10, 2019, before the market opened, Hecla filed its quarterly report on Form 10-Q for the period ending March 31, 2019, which stated, in part:

We are currently undertaking a review of spending at the Nevada operations which may result in the following changes at the Fire Creek mine: a reduction in capital spending; ceasing current production and only developing to spirals 9,10 and 11; or a temporary cessation of all mine operations at Fire Creek. As a result, the values of certain components of properties, plants, equipment and mineral interests could be adjusted in the second quarter of 2019 when we expect to finalize the allocation of the Klondex purchase price. The outcome of the review may constitute a triggering event requiring assessment of the carrying value of our long-lived assets at Fire Creek with the potential to impact near-term estimated cash flows. The mineral interests at Fire Creek have a preliminary carrying value of approximately $220 million, of which approximately $46 million is depletable. We may recognize an impairment, which could be material, if the carrying value of the assets exceeds the estimated future undiscounted cash flows expected to result from their use and eventual disposition.

114.    On May 10, 2019, Hecla's common stock declined $0.21 per share, or 11.86%, to close at $1.56 per share, causing a loss of more than $100 million in market capitalization.

115.    On June 6, 2019, Hecla issued a press release entitled "Hecla Reduces Spending for Nevada Operations," in which the defendant Baker stated: "the Nevada operations have not generated the cash flow we had hoped for so we are curtailing most development and reducing the workforce with the goal of the operation generating positive cash flow in the second half of the year." The Company further stated:

A review has been conducted of the Nevada operations and changes are being made with the goal of turning it into a positive cash flowing unit.

***The new approach is to mine the currently developed ore at Fire Creek. Mining at Midas is expected to continue through the end of the year, but Hollister will be shut down. As a result, 25% of the Nevada workforce is being laid off.*** Some surface exploration drilling and hydrology studies are still planned to gather information on the deposits to help make future development programs more successful.

Third-party ore processing arrangements are also being pursued to try and reduce the transportation and milling costs. This could include mills that can process ore that is considered refractory. With water discharge from Fire Creek more than double of a year ago, work is underway to increase discharge permits and change how the water is treated.

***The Company is still committed to the exploration and definition of Hatter Graben, which is one of the key reasons the Nevada operations were acquired.***

> ***However, the level of development activity is being curtailed to reduce the cash consumption***, and the focus instead is expected to be on surface drilling with the goal of gaining more information on potential expansions of the deposit and to help plan the most efficient route to get to the deposit, once development is restarted.
>
> The Company is providing revised annual 2019 Nevada production estimates of 60,000 ounces at a cost of sales of $105 million, a cash cost, after by-product credits of $1,200 per gold ounce and an all-in sustaining cost, after by-product credits, of $1,700 per gold ounce.

(Emphasis added).

116.    Also, on June 6, 2019, during the conference call to discuss the Nevada Operations,

defendant Baker stated as follows:

> Before I go to our go-forward plan in Nevada that we announced today, I want to talk about the approach we have taken so far. You might recall we said our strategy was to develop and drill at Fire Creek. But that development drilling did not lead to the ounces and cash flow we expected. This has led us to reevaluate our plan in Nevada because we expect our assets to operate on a cash-positive basis, and clearly, this one has not.
>
> We are choosing to take a slower, more considered approach to Nevada. We studied the ore bodies through exploration drilling, so that the cash consumption is expected to be significantly lower and our future activities had a higher chance of success. Consistent with this strategy today, we announced that we are focusing on mining at Fire Creek and pausing most of our development activities in Nevada given the cash outflow the mines had since acquisition.
>
> With the limited development we planned at Fire Creek, we expect to mine all of the development ore available for near-term production primarily off of Spiral 2 by early 2020. Production is stopping from Hollister and is planned to continue at Midas only until year-end as we consolidate the workforce into Fire Creek.
>
> *       *       *
>
> We plan to continue to advance the work on permitting and hydrology. At Fire Creek, the water discharge in the first 5 months of this year is over 2x what it was over the same period last year. We currently have consumptive water rights for about 160 gallons per minute out of the mine and are working on strategies to allow higher flows up to about 400 gallons per minute based on our recent work in Spiral 4.
>
> *       *       *
>
> Our experience tells us that we are in one of the best places to find and operate a high-grade, long-term mine. When we get to the end of mining primarily off of

44

Spiral 2 in 2020 as we expect, we will see where we go from there. If the things we are working on come together, then we would then mine off Spirals 4 and 3. We also look at how we can do enough development to drill the highest-priority targets like Hatter Graben.

So what went wrong? As we previously described, we expected the [filling] of the indicated resources to result in higher grades as was historically the case on the project and that an increase in development will allow an increase in throughput lowering the cutoff grades. This hasn't proven to be the case in the new areas of the mine. And we're seeing more refractory ore and poor ground conditions than encountered.

While we recognized some of these issues as is typical with any acquisitions, we could -- we believed we could bring improvements and still do. But these issues were more challenging and take more time and study than we thought. While we will assess whether we have a triggering [event] to determine impairment at the end of the second quarter, I don't currently anticipate that the potential impairment would be large. Why do I say this? Because the acquisition decision ultimately was made mainly on the exploration potential that we saw in each of the properties, not the existing reserves. That has not changed. What has changed is mining at Fire Creek, which had very little reserves. We have not finished evaluating how we can approach Fire Creek with the improvements that we think can be done.

117.    Later, in the same conference call, in response to an analyst's question, defendants

Baker and Radford clarified that the water issues were one of many reasons for their decision:

[Baker:] I'm going to let Larry answer it, but before I do, let me just say that from my perspective, the dewatering is just one of the issues. It's not the only one, and it really relates mostly to Spiral 4. And it's -- when we look forward, we say our plan's not going to be what we thought it could be. And, Trevor, the thing that's been the surprise is the rate of increase that we've had. I mean it has literally doubled. I was in a meeting yesterday, and the guys gave the discharge numbers. And it's -- over the first 5 months, it's literally doubled. I think it's gone from 29 gallons per minute to 63 or something in that order of magnitude -- 23 to 69, that order of magnitude. So it is then something that we were not anticipating, but it's not been the only issue. Larry, why don't you add to my comments?

[Radford:] Well, certainly, in the -- as Phil has mentioned in the south side of the mine, there's considerable amount of water encountered in Spiral 4 and Titan areas, and it precluded us from moving forward in those areas. As I said before, there's -- there are a couple of things that affected 2019. One is, although development in the aggregate is on track the -- or was on track, the development in certain areas was hampered by conditions, principally water. And so that was a factor. And then as I said before, some of the definition drilling that we did, it wasn't huge but certainly impacted. That was -- it turned out negatively for us and took some of the ounces that we had planned for 2019 off-line.

And as we get out further from the core of the ore body in the future, then we need to understand metallurgy better. We're working on that and looking at options for potential alternate processing.

**D.    The Director Defendants Made False and Misleading Statements in Hecla's 2018 and 2019 Proxy Statements**

118.    Plaintiff's allegations with respect to the misleading statements in the 2018 and 2019 Proxy Statements are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

119.    On April 9, 2018, Hecla issued its Proxy Statement for the 2018 Annual Meeting of Shareholders, to be held on May 24, 2018 (the "2018 Proxy"). In the 2018 Proxy, the Director Defendants solicited stockholder votes to, among other things, reelect defendants Nethercutt, Ralbovsky, and Boggs to the Board. In support of their bid to reelect defendants Nethercutt, Ralbovsky, and Boggs, the Director Defendants highlighted their duties and their supposed successful oversight of the Company, as set forth below. The Director Defendants negligently issued misleading statements with respect to these solicited votes.

120.    On April 9, 2019, Hecla issued its Proxy Statement for the 2019 Annual Meeting of Shareholders, to be held on May 23, 2019 (the "2019 Proxy") (the 2018 Proxy and the 2019 Proxy are collectively, the "Proxy Statements"). In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things, reelect defendants Crumley, Rogers, and Stanley to the Board. In support of their bid to reelect defendants Crumley, Rogers, and Stanley, the Director Defendants highlighted their duties and their supposed successful oversight of the

Company, as set forth below. The Director Defendants negligently issued misleading statements with respect to these solicited votes.

121.    The 2019 Proxy described the Board's oversight of risk as follows:

The Board actively oversees and monitors the most significant risks that could impact Hecla's operations. The Company identifies, assesses, and assigns responsibility for managing risks through an enterprise risk assessment process, our internal control environment and other internal processes. The Board and management coordinate the risk oversight role in a manner that serves the long-term interests of the Company and its shareholders through established periodic reporting and open lines of communication.

122.    Additionally, both the 2018 and 2019 Proxy Statements stated the following with respect to the Board's oversight duties:

[The] Board acts as the ultimate decision-making body of the Company on certain fundamental matters and advises and oversees senior management, which is responsible for the day-to-day operations and management of the Company. In carrying out its responsibilities, the Board reviews and assesses Hecla's long-term strategy.

*       *       *

The Board is responsible for overseeing Hecla's risk management practices related to our business strategies and operations. In performing this oversight role, our Board is responsible for ensuring that the risk management processes designed and implemented by management are functioning, and that necessary steps are taken to foster a culture of risk-adjusted decision-making within Hecla.

123.    With respect to the key oversight responsibilities of the Board's Audit Committee, the 2018 and 2019 Proxy Statements both stated that its "oversight and management responsibilities" included "[f]inancial statement integrity and reporting," and monitoring "compliance with securities and financial regulations." The Proxy Statements further stated that the functions of the committee included "assist[ing] the Board in fulfilling its oversight responsibilities" and "review[ing] [Company] compliance with laws and regulations, including disclosure controls and procedures." The 2019 Proxy included the additional function, "review[ing] the financial risks."

47

124.     With respect to the key oversight responsibilities of the Board's HSE&T Committee, the 2018 and 2019 Proxy Statements both stated that its "oversight and management responsibilities" included "[o]verse[ing] operational, reserve and other technical risks." The Proxy Statements further stated that the functions of the committee included "review[ing] the [Company's] operational and exploration performance," "review[ing] the technical activities of the Company," and "mak[ing] recommendations to the Board concerning the advisability of proceeding with the exploration, development, acquisition or divestiture of mineral properties and/or operations."

125.     Accordingly, the Proxy Statements both incorrectly claimed and led reasonable investors to believe that: (i) the Board was engaged in appropriate and active risk oversight of the Company; (ii) the Audit Committee exercised appropriate oversight of the Company's financial statements and reporting, monitored compliance with securities and financial regulations, and oversaw financial risks; (iii) the HSE&T Committee appropriately monitored operational and exploration performance, oversaw operational, reserves, and other technical risks; and (iv) as a result, defendants Nethercutt, Ralbovsky, and Boggs (in 2018) and defendants Crumley, Rogers, and Stanley (in 2019), as members of the Board and the Audit or HSE&T Committees, were well-informed about and exercised appropriate oversight over Hecla's operations, risk management, controls, and public disclosures.

126.     In reality, the Board and its Audit and HSE&T Committees, which include defendants Nethercutt, Ralbovsky, Boggs, Crumley, Rogers, and Stanley (who were each up for reelection), did not exercise active and appropriate oversight over the Company's operations, risk management, controls, and public disclosures. Instead, as described herein, they made or allowed to be made improper statements in Hecla's press releases, public filings, and other public

48

statements relating to the Company's Nevada Operations; they failed to appropriately implement functioning risk management processes designed to address significant risks to the Company such as risks associated with the undisclosed problems at the Company's Nevada Operations; and they utterly failed to ensure compliance with applicable securities laws through implementation of functioning disclosure controls and procedures. Accordingly, the Director Defendants were negligent in including these misleading statements in the Proxy Statements.

127.    The Proxy Statements harmed Hecla by interfering with the proper governance on the Company's behalf that follows the free and informed exercise of the stockholders' right to vote for directors. As a result of the misleading statements in these proxies, Hecla's stockholders voted via an uninformed stockholder vote to reelect defendants Nethercutt, Ralbovsky, Boggs, Crumley, Rogers, and Stanley to Hecla's Board.

## VIII.   DAMAGES TO HECLA

128.    As a result of the Individual Defendants' improprieties, Hecla disseminated improper public statements concerning its Nevada Operations. These improper statements have devastated Hecla's credibility and caused the Company to lose more than $230 million in market capitalization.

129.    The Individual Defendants' improper course of conduct has also subjected the Company to potentially tens of millions of dollars in damages in connection with the Securities Class Actions. The Securities Class Actions allege that the Company and certain Individual Defendants, including defendants Baker, Hall, and Radford, violated federal securities laws by repeatedly misrepresenting the Company's Nevada Operations.

130.    These actions have irreparably damaged Hecla's corporate image and goodwill. For at least the foreseeable future, Hecla will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public,

such that Hecla's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired. The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

131.    As a direct and proximate result of the Individual Defendants' conduct, the Company has expended, and will continue to expend, significant sums of money. These additional expenditures include, without limitation: (i) costs incurred in investigating and defending Hecla and the Securities Class Action Defendants in the Securities Class Actions, and (ii) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Hecla, which compensation was based at least in part on Hecla's stock price which was artificially-inflated by the Individual Defendants' misconduct.

## IX.    DERIVATIVE ALLEGATIONS

132.    Plaintiff brings this action derivatively in his own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Hecla as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

133.    Hecla is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff is a current stockholder of Helca and has continuously owned such shares since 1999. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

135.    Because the Individual Defendants lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

136.    The wrongful acts complained of herein subjected, and continue to subject, Hecla to harm.

## X.    FUTILITY ALLEGATIONS

137.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

138.    Hecla's current Board consists of defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile and useless act.

### A.    Demand Is Excused as to Defendant Baker Because He Lacks Independence

139.    As a preliminary matter, Hecla has conceded in its SEC filings that defendant Baker is not an independent director. Specifically, in the 2019 Proxy, defendant Baker is not listed as one of the allegedly independent directors. According to the Company, he cannot be deemed independent under the NYSE listing standards.

140.    Furthermore, defendant Baker is not an independent director because his principal professional occupation is his employment with Hecla. Baker has served as the Company's CEO since May 2003 and its President since November 2001, and has received and continues to receive substantial monetary compensation and other benefits:

| YEAR | SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | CHANGE IN PENSION VALUE AND NON-QUALIFIED DEFERRED COMP. EARNINGS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| 2018 | $635,000 | $870,859 | $1,844,625 | $317,452 | $18,606 | $3,686,542 |
| 2017 | $618,750 | $842,802 | $2,473,625 | $1,017,111 | $18,306 | $4,970,594 |
| 2016 | $484,000 | $1,190,811 | $2,876,375 | $924,335 | $15,900 | $5,491,421 |

141.    Accordingly, defendant Baker lacks independence from defendants Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley due to his interest in maintaining his

executive position. This lack of independence renders defendant Baker incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.     Demand Is Excused Because the Entire Board Faces a Substantial Likelihood of Liability for Their Misconduct**

142.    Defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley violated section 14(a) of the Exchange Act by negligently making material misstatements and omissions in the Proxy Statements. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, any indemnification provided by the Company to defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley does not protect them from their violations. As a result, defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley face a substantial likelihood of liability, excusing a demand.

143.    Defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley, breached their fiduciary duties of loyalty and good faith by making or allowing to be made improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. In making or allowing these improper statements, defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley breached their fiduciary duties. Accordingly, all the members of the Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

144.    The entire Board, and in particular defendants Boggs, Nethercutt, Ralbovsky, and Stanley, as members of the Corporate Governance Committee at the time of the wrongdoing, are charged with overseeing compliance with the Company's Code of Conduct, including ensuring that directors, officers, and employees do not misrepresent Hecla and that all state and federal securities laws are followed. As described herein, defendants Baker, Crumley, Boggs, Johnson,

Nethercutt, Ralbovsky, Rogers, and Stanley breached their duty of loyalty and good faith by failing to properly oversee compliance with the Code by allowing, and failing to timely remedy, the improper statements and securities law violations described herein. For these reasons, defendants Baker, Crumley, Boggs, Johnson, Nethercutt, Ralbovsky, Rogers, and Stanley face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

145.    Defendants Baker and Hall, as Hecla's CEO and CFO, have additional duties under the Company's Code of Ethics, including overall responsibility for establishing and administering appropriate disclosure and accounting controls and otherwise ensuring full, fair, timely, and understandable disclosure concerning the Company and its operations. As described herein, Baker and Hall breached their duties of loyalty and good faith by approving or otherwise allowing the improper statements, and by failing to appropriately establish and administer Hecla's public disclosure controls and procedures to prevent such improper statements. For these reasons, defendants Baker and Hall face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

146.    Defendants Boggs, Johnson, Ralbovsky, and Stanley, as members of the Audit Committee, had a duty to properly oversee Hecla's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements detailed herein. The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failing to properly oversee Hecla's compliance with legal and regulatory requirements and the Company's disclosure controls. For

these reasons, defendants Boggs, Johnson, Ralbovsky, and Stanley face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

147.   Defendants Johnson, Ralbovsky, Rogers, and Stanley, as members of the HSE&T Committee at the time of the wrongdoing, had a duty to properly oversee the Company's mine construction, operations, development and production, and to manage risks relating to the foregoing. As described herein, defendants Johnson, Ralbovsky, Rogers, and Stanley breached their duty of loyalty and good faith by allowing or otherwise failing to manage risks relating to the false and misleading public disclosures concerning the Nevada Operations. For these reasons, defendants Johnson, Ralbovsky, Rogers, and Stanley face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

148.   Any suit by the current directors of Helca to remedy these wrongs would also expose defendant Baker (and defendants Hall, Radford, and Nominal Defendant Hecla) to liability for violations of the federal securities laws in the pending Securities Class Actions, and would result in civil actions being filed against one or more of the other Individual Defendants. The Securities Class Actions allege violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendant Baker and others in this action, then Hecla's efforts would compromise its defense of the Securities Class Actions.

### C.   Demand Is Excused as to Defendants Stanley and Baker Due to Their Overlapping Business Affiliations

149.   Defendants Stanley and Baker are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing, overlapping business relationships. In particular, Stanley and Baker both served as members of the board of directors of QEP Resources, Inc. (an independent natural gas and oil exploration and production company)

between May 2010 and January 2019. Between 2004 and 2010, Baker served on the board of Questar Corporation where Stanley was also a director and an officer since 2002. Baker was paid compensation for his duties as a QEP Resources director of $289,506, $270,007, and $257,504 for 2018, 2017, and 2016, respectively. Stanley was paid compensation for his duties as QEP Resource's Chairman, President, and CEO of $6,798,430, $7,231,169, and $7,096,612 for 2018, 2017, and 2016, respectively. Upon his retirement in January 2019, Stanley received $15,753,932 in compensation including a $6,764,333 cash severance, plus additional benefits under QEP's Pension Plan, the SERP and the Deferred Compensation Wrap Plan. There is reasonable doubt that defendants Stanley and Baker would vote to initiate litigation against each other due to these long-standing business relationships. Demand is therefore futile as to defendants Stanley and Baker.

###### D.    Demand Is Excused as to Defendants Crumley, Boggs, Nethercutt, and Rogers Due to Their Membership on the Compensation Committee

150.    Defendants Crumley, Boggs, Nethercutt, and Rogers serve together on the Compensation Committee. These four individuals set at least portions of their own compensation, as well as the compensation of their colleagues, Baker, Johnson, Ralbovsky, and Stanley. Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a shareholder demand to investigate or prosecute an action pertaining to the Individual Defendants' illegal conduct.

## XI.    DEMAND ON SHAREHOLDERS IS UNNECESSARY

151.    Plaintiff has not made any demand on the other stockholders of Helca to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Hecla is a publicly held company with 486,232,104 shares outstanding as of May 7, 2019, and with hundreds or thousands of geographically dispersed stockholders;

(b)     making demand on such a number of stockholders would be impossible for Plaintiff who has no way of finding out the names, addresses, or phone numbers of Hecla's stockholders; and

(c)     making demand on all stockholders would force Plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## XII.   CLAIMS FOR RELIEF

### COUNT I

**For Contribution for Violations of § 10(b) and § 21D of the Exchange Act
(Against Defendants Baker, Hall, and Radford)**

152.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    Defendant Baker, Hall, and Radford are named defendants in the Securities Class Actions.

154.    Hecla is named as a defendant in the Securities Class Actions, which assert claims under the federal securities laws for, inter alia, violations of section 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein. The Company is entitled to receive contribution from the Securities Class Action Defendants in connection with the Securities Class Actions against the Company.

155.    Defendants Baker, Hall, and Radford as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Hecla, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct

56

that violated section 10(b) of the Exchange Act and Rule 10b-5. Further, defendants Baker, Hall, and Radford are liable under section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

156. As a result, defendants Baker, Hall, and Radford damaged Hecla and are liable to the Company for contribution.

157. Plaintiff, on behalf of Hecla, has no adequate remedy at law.

**COUNT II**

**Violation of Section 14(a) of the Exchange Act**
**(Against the Director Defendants)**

158. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

160. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders, which were contained in the Proxy Statements. In the Proxy Statements, the Board solicited stockholder votes to reelect themselves to the Board.

161. The Proxy Statements incorrectly claimed and led reasonable investors to believe that: (i) the Board was engaged in appropriate and active risk oversight of the Company; (ii) the

Audit Committee exercised appropriate oversight of the Company's financial statements and reporting, monitored compliance with securities and financial regulations, and reviewed financial risks; (iii) the HSE&T Committee appropriately monitored operational and exploration performance, oversaw operational, reserves, and other technical risks; and (iv) as a result, defendants Nethercutt, Ralbovsky, and Boggs (in 2018) and defendants Crumley, Rogers, and Stanley (in 2019), as members of the Board and the Audit or HSE&T Committees, were well-informed about and exercised appropriate oversight over Hecla's operations, risk management, controls, and public disclosures. In reality, the Board and its Audit and HSE&T Committees, which include defendants Nethercutt, Ralbovsky, Boggs, Crumley, Rogers, and Stanley (who were each up for reelection), did not exercise active and appropriate oversight over the Company's operations, risk management, controls, and public disclosures.

162.   By reason of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Hecla misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Hecla's recommendation to reelect certain Board members.

163.   The misleading information contained in the Proxy Statements was material to Hecla's stockholders in determining whether to elect these defendants. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the Proxy Statements was an essential link in the reelection of nominees to the Board.

164. Plaintiff, on behalf of Hecla, hereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper reelection of the members of the Board.

## COUNT III

### Breach of Fiduciary Duties
### (Against the Individual Defendants)

165. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166. The Individual Defendants owed and owe Hecla fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Hecla the highest obligation of good faith, fair dealing, loyalty, and due care.

167. Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

168. The Securities Class Action Defendants were reckless or grossly negligent in disseminating the improper statements detailed herein. The Securities Class Action Defendants intentionally, recklessly, or with gross negligence made improper statements in Hecla's press releases, public filings, and other public statements relating to the Company's Nevada Operations. Accordingly, these defendants breached their duty of care and loyalty to the Company.

169. The Director Defendants, as directors of the Company, owed Hecla the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly disseminating or otherwise permitting the Company to disseminate the improper statements detailed herein. The Director Defendants knew or were reckless in not knowing that the Company's newly acquired Nevada mines faced many undisclosed material problems that would prevent the operations from

being cash flow positive or even cash flow neutral. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

170.    The Director Defendants, and the Corporate Governance Committee Defendants in particular, had a duty to properly oversee compliance with Hecla Code of Conduct. The Code, which applies to all directors, officers, and employees, requires compliance with all applicable securities laws and rules by, among other things, ensuring the Company's SEC filings and other public communications contain full, fair, accurate, timely, and understandable disclosures. As described herein, the Corporate Governance Committee Defendants and the other Director Defendants breached their duty by utterly failing to properly oversee compliance with the Code by, *inter alia*, allowing the improper statements and securities law violations described herein. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

171.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving or otherwise allowing the improper statements, which they knew or were reckless in not knowing omitted material facts and contained material misstatements. The Audit Committee Defendants also completely and utterly failed in their duty of oversight and failed to properly oversee Hecla's (i) compliance with legal and regulatory requirements, (ii) public disclosure controls and procedures, (iii) risk assessment and management, and (iv) internal control functions.

172.    The HSE&T Committee Defendants breached their fiduciary duty of loyalty by failing to properly oversee the Company's mine construction, operations, development, and production, and/or by failing to correct or otherwise appropriately manage the risks relating to the false and misleading public disclosures concerning the Company's Nevada Operations.

173.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hecla has sustained significant damages. Accordingly, these defendants are liable to the Company.

174.    Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against the Individual Defendants)

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    As a result of the Individual Defendants' failure to implement adequate controls to ensure that the Company's SEC filings and other public statements were not misleading, Hecla is subject to the Securities Class Actions. The Individual Defendants have caused Hecla to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

177.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

178.    Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## COUNT V

### Unjust Enrichment
### (Against the Individual Defendants)

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Hecla. The Individual Defendants were unjustly

enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Hecla.

181.    Plaintiffs, as stockholders and representatives of Hecla, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

182.    Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a stockholder demand on the Hecla Board would have been a futile and useless act;

B.    Finding that the Individual Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.    Directing Hecla to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hecla and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting controls;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a provision to permit the stockholders of Hecla to nominate three candidates for election to the Board; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions.

D.      Against each of the Individual Defendants in favor of Hecla for the amount of damages sustained by Hecla, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring the Individual Defendants to return to Hecla all compensation and remuneration of whatever kind paid to them by Hecla during the time that they were in breach of the fiduciary duties they owed to Hecla;

F.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Hecla's directors, officers, and employees do not engage in wrongful or illegal practices;

G.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as this Court deems just and equitable.

## XIV.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: July 12, 2019

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3800
*Attorneys for Plaintiff Donald Kooker*

**OF COUNSEL**
**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Attorneys for Plaintiff Donald Kooker*